POWESHIEK COUNTY, Appellee, v. MERCHANTS NATIONAL BANK OF GRINNELL et al., Appellants.

No. 37754.

June 26, 1928.

Opinion on Rehearing December 13, 1929.

*J. H. Patton* and *Frank Bechly,* for appellants.

*R. W. Boyd* and *Talbott & Talbott,* for appellee.

Morling, J.—I. The receiver petitioned for removal to the Federal court on the ground that the suit involved "matter of the distribution of the assets of a national bank, and is, in effect,  one to establish a preference contrary to Federal law." Removal was denied. Plaintiff's petition alleges that $19,889.93 of the public funds of the plaintiff was deposited in the defunct bank by plaintiff's treasurer, and that the deposits were unlawful, in that no bond to secure plaintiff against loss on account of them was furnished, as required by statute; that the bank received and held the funds as trustee, and mingled them with its other assets, whereby they became "a part of the moneys, accounts, bills and notes which came into the hands" of the receiver. The prayer is for decree establishing that the fund of $19,889.93 is a trust fund, and that the bank and the receiver hold the same as trustee, and directing the receiver to repay the same to plaintiff in full out of the proceeds of moneys, accounts, and bills and notes which came into his hands as such, before any of such funds are paid to depositors or other creditors.

The right to removal at the time the petition for removal was filed depended upon the allegations of plaintiff's petition, the

theory of which was that the bank had wrongfully received the plaintiff's money, and had commingled it with its assets; that in its commingled form it had come into the possession of the defendant receiver; that this fund never belonged to the bank, and consequently the receiver never got any title to it. In short, the suit, on the face of plaintiff's petition, was one to recover plaintiff's property from the possession of defendant. The fact that the defendant, as a receiver of a national bank, was an officer of the United States did not render him immune from suit in the state court to recover property to which the bank of which he was receiver and to which he, as receiver, never obtained any title. On the face of the petition, no Federal question was involved. *Capital Nat. Bank v. First Nat. Bank,* 172 U. S. 425 (43 L. Ed. 502, 19 Sup. Ct. Rep. 202).

II. At the time the deposits in question were made, no bond securing their payment to plaintiff was in force. The deposits were, therefore, made without authority, and the bank got  no title to funds so deposited. *Leach v. Stockport Sav. Bank,* 207 Iowa 478, and cases there cited. It devolves upon the plaintiff to prove that it had funds which were so unlawfully deposited in the bank. Having so proved, and traced its funds into the possession of the bank, and shown that the bank obtained such possession wrongfully, and that funds in the bank such as those deposited have come into the hands of the receiver, the plaintiff, in the absence of countervailing circumstances, is, in this jurisdiction, entitled to the benefit of a presumption that the bank did not dissipate or unlawfully part with the funds which it thus held in trust, but that such funds so coming into the receiver's possession included those belonging to the plaintiff. Idem. Under such circumstances, the burden of going on with the case rests with the receiver, and it is for him to show dissipation by the bank, rather than for plaintiff, under the rule adopted in this jurisdiction, to more specifically trace its funds into some particular fund or property in the hands of the receiver. The question in the final determination of this case is whether, under the evidence and applicable presumptions, the receiver is shown to have in his possession the funds or property of the plaintiff.

The Merchants National Bank finally closed its doors on the

evening of October 31, 1924. Plaintiff's treasurer had kept an account with the bank. Proper bond had been given, and was in force apparently up to April 15, 1924. Prior to that date, the surety had refused to renew. The county officials apparently overlooked the absence of a renewal. The claim is for unpaid balance of deposits after April 15, 1924. The method of making these deposits was this: The bank paid taxes and automobile license fees for its customers. The deposit account in question was made up of payments made to the bank for taxes and automobile fees so paid by the bank. The county treasurer testifies:

"The Merchants National Bank, when they wanted to pay taxes, they would send me memorandum of taxes, and from that memorandum I would issue tax receipts and make a deposit slip and send with the tax receipts to the bank. For motor vehicle business, they would send an application signed by the party, and I would issue the certificate of registration and send that and the plates to the party making the application, and send a deposit slip, indicating on that deposit slip the name of the party that the registration was made in * * * I made deposits in other ways than by deposit of items of which I was notified by the bank. I sent them deposits independent and different from that procedure. * * *"

The treasurer testifies that he did not, after April 15, 1924, deposit any cash; that each check deposited was one drawn upon the (now) defunct bank. It is shown that "the great bulk" of taxes so paid were paid by checks of the bank's customers, drawn upon their own accounts in the defunct bank, though occasionally the bank (not the county treasurer) got checks on other banks, and occasionally actual money in payment of taxes. The only evidence of the amount of cash in the possession of the bank at the time the various items of taxes were thus paid and deposits made is a statement in an amendment to the abstract that:

"Exhibits 56 and 56A shows that, from September 29, 1924, to and including October 31, 1924, the least amount of cash on hand in the bank at any time was $12,641.49."

Exhibit 56 was merely identified as the general balance book

of the Merchants National Bank. Exhibit 56A is the balance sheet of the last day on which the bank was doing business, October 31, 1924. There is sufficient evidence of the truth of the matters set out in Exhibit 56A. There is no evidence of the correctness of the book entries with respect to other matters, such as the other cash balances. The offer of the book Exhibit 56 in evidence was properly objected to. Defendants have here referred to the balance book as showing the condition of the bank at other dates, but it cannot be said that a sufficient foundation is laid for the admission of the balance book, or that it is accepted by defendants as in evidence. The statement that the least amount of cash at any time was $12,641.49 manifestly refers to the balance on October 31, 1924. The evidence is that, while this item is called ''cash,'' only $4,490.94 (about 35 per cent) was money, $4,607.89 checks on other Grinnell banks, which have been collected by the receiver, and $507.97 in a cash item which has been collected. The other cash items were such as ''items that have been paid out by the bank and not charged to any particular account; may be returned checks, worthless checks; may be made up of any number of items, different items representing cash paid out and uncollected.'' There were outstanding on October 31, 1924, cashier's checks to the amount of $14,403.90, —more than the total cash and cash items. The record is silent as to the available cash on other dates. The bills receivable were $1,319,290.54, stockholders' liability assessment $38,345, deposits something less than $1,000,000, bills payable $217,009, rediscounts $162,442.47. Of the bills receivable, $762,308 were pledged as collateral, or held by the Federal Reserve Bank as rediscounts. The bank was indebted to the Federal Reserve on overdrafts in the sum of $43,000, in addition to liability on rediscounts. Balances in correspondent banks at the time of closing were applied upon the indebtedness to them. The county treasurer's balance with the defunct bank on April 15, 1924, was $53,347.68. The account was active, and deposits were made or funds withdrawn every few days. In the latter part of September and first part of October, the most active period for tax collections, many deposits were made. The credit balance September 30, 1924, was $31,907.21. Deposits dated October 4, 1924, aggregated over $15,000; October 7th, over $6,350; October 21st, over $2,245; October 29th, $513; and from October 4th to and

including October 29, 1924, more than $24,000. The balance October 31, 1924, was $19,889.93. So that, when we apply the general rule of application of payments to the items of debit in the order in which they are incurred, the deposits for which this balance is claimed were made on and after October 4, 1924. Money is borrowed on bills payable and rediscounts to obtain and maintain balances of cash and credit necessary to meet the demands of depositors and borrowers. Obviously, this bank had been for a considerable time on the verge of suspension. The plaintiff's treasurer deposited no money. He deposited merely the checks of or debits against customers of the (now) defunct bank, drawn on or charged by that bank. The so-called deposits consisted merely of transfers of credit from the accounts of other customers of the defunct bank to the account of the plaintiff in the bank. It is claimed that the deposit of such checks was the equivalent of the presentation of the checks at the counter, the receipt of the money, and its redeposit to the credit of the plaintiff. The record furnishes no evidence that, on October 4, 1924, the customers' checks which were then deposited in behalf of plaintiff to the amount of more than $15,000, or on October 7th, such checks amounting to $6,350, or on October 21st, $2,245, would have been paid in cash, if presented at the counter. The court is asked, on these conditions, to presume not only that checks to the amounts mentioned would, if presented, have been paid in cash, but that, if the customers of the bank had, on the dates mentioned, requested the bank to pay in cash their taxes, as now shown by transfers to the county treasurer's account, the bank would have so paid them. Such a presumption would not only strain even credulity to the breaking point, but would be contrary to uniform experience. A failing bank resorts to every imaginable expedient to delay and to stop the outflow of its funds. *Messenger v. Carroll Tr. & Sav. Bank,* 193 Iowa 608, is relied upon. In that case, the bank received for collection a sight draft of $1,411.98, drawn on one of its depositors, with instructions to surrender the bill of lading attached, only on payment and remittance of the full amount to the drawer of the sight draft. The bank accepted the check of the drawee of the sight draft upon the drawee's account with the collecting bank, which account then showed a credit balance of $4,500. For the collection, the collecting bank remitted its draft.

The bank had on hand $15,000 in cash, of which not less than $10,000 went into the possession of the receiver. In those circumstances, it was held that the transaction was the equivalent of the payment of money by the drawee of the sight draft; hence that the assets of the defunct bank were augmented in "the same manner as the delivery of currency would have done."

In *Leach v. Farmers Sav. Bank of Hamburg*, 204 Iowa 1083, it was shown that, when deposits were made, "there was at all times in the vaults of the bank money far in excess of the amount of deposits thus made." It is there said:

"When the city treasurer presented the county treasurer's check on these funds, it is therefore apparent that, had he requested cash on the county treasurer's check, there was actual money in the bank far in excess of that necessary to meet the check. The law does not require the doing of idle things. * * * When the bank received the check and charged it to the county treasurer's account, it, in effect, withdrew that amount from his account and paid it to the city treasurer. The city treasurer then redeposited the same to his own credit * * *."

If we were to presume as requested, the trust could be established only to the amount of $4,490.94; for it cannot be presumed that the funds deposited were invested in the cash items  or in bills receivable of the bank or in balances standing to the credit of the defunct bank with its correspondents or in other forms of property. *Leach v. Iowa State Sav. Bank of Sioux City*, 204 Iowa 497; *Leach v. Farmers Tr. & Sav. Bank of Dedham*, 204 Iowa 1343; *Leach v. Stockport Sav. Bank*, 207 Iowa 478; *Andrew v. State Bank of New Hampton*, 205 Iowa 1064. But the claimed presumption as to any of these transfers of credit, even that of October 29, 1924, $513, two days before the bank closed (if we were asked to establish a trust as to the items  separately), is, under the circumstances here, too violent to be permissible. Plaintiff is asking for a pyramiding of presumptions. Presumption must rest on facts which are proved. It may not

474

be supported by another presumption. *Thayer v. Smoky Hollow Coal Co.*, 121 Iowa 121, 130.—*Reversed.*

ALBERT, C. J., and STEVENS, DE GRAFF, and KINDIG, JJ., concur.

WAGNER, J., not participating.